**IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF MISSISSIPPI
JACKSON DIVISION**

**Illinois Central Railroad Company**                                      **PLAINTIFF**

**VS.**                                      **CIVIL ACTION NO. 3:09CV473-HTW-LRA**

**Cryogenic Transportation, Inc. et al**                                      **DEFENDANTS**

_____

**Clydine Daniel, in her capacity as**                                      **COUNTER-PLAINTIFF**
**Administratrix/executrix/personal**
**Representative of the Estate of**
**Michael Daniel, Deceased; Clydine**
**Daniel, individually**

**VS.**

**Illinois Central Railroad Company**                                      **COUNTER-DEFENDANT**

**One Beacon America Insurance Company**                                      **INTERVENOR PLAINTIFF**

**ORDER GRANTING IN PART AND DENYING
IN PART SUMMARY JUDGMENT**

In this lawsuit, defendant and counter-plaintiff Clydine Daniel ("C. Daniel") has

filed counter-claims against the original plaintiff, Illinois Central Railroad Company

("ICRR"), accusing ICRR of negligently causing the death of her husband, Michael

Daniel ("M. Daniel"), when an ICRR train collided with the decedent's tanker-truck at a

railroad crossing.  ICRR filed this tort lawsuit alleging M. Daniel's negligence and

seeking recompense from M. Daniel's employer and M. Daniel's estate for, among

other things, damage to the train, railroad tracks, and right-of-way.  All parties and

claims have been dismissed or settled, except C. Daniel's counter-claims against ICRR.

Now before this court is ICRR's motion for summary judgment on C. Daniel's counter-claims [docket no. 268].  Also before the court are: a motion to bifurcate filed by ICRR [docket no. 266]; three motions filed by ICRR to exclude the testimony of C. Daniel's expert witnesses [docket nos. 273, 275, and 298]; a motion for leave to file excess pages filed by ICRR [docket no. 290]; and a motion to set/reset hearings filed by C. Daniel [docket no. 305].

## I.  Procedural History and Jurisdiction

On August 11, 2009, ICRR filed the underlying lawsuit in this federal court pursuant to this court's diversity subject matter jurisdiction, Title 28 U.S.C. § 1332(a)[1]. The plaintiff, ICRR, an Illinois corporation with its principal place of business in the State of Illinois, accused M. Daniel, now deceased, of negligently operating his tractor-trailer truck and causing a collision between M. Daniel's truck and an ICRR train at a grade crossing in Star, Mississippi.  ICRR sued Cryogenic Transportation, Inc., M. Daniel's employer, and C. Daniel, the administratrix, executrix, and personal representative of the decedent, M. Daniel.  M. Daniel was a resident of Alabama.  His widow C. Daniel, the defendant and counter-plaintiff, is a resident of Alabama. Cryogenic Transportation, Inc., is a Pennsylvania corporation with its principal place of business in Quakertown, Pennsylvania. The amount in controversy exceeds $75,000, exclusive of costs and interest.

With her answer to ICRR's complaint, C. Daniel filed the counter-claims now before this court against ICRR in her individual capacity, on behalf of M. Daniel's

---

[1]  Title 28 U.S.C. § 1332(a)(1) states that "[t]he district courts shall have original jurisdiction of all civil actions where the matter in controversy exceeds the sum or value of $75,000, exclusive of interest and costs, and is between--citizens of different States;"

wrongful death beneficiaries, and as the personal representative of the estate of M. Daniel.  Answer and counter claim, docket no. 9.

This court has subject matter jurisdiction over the original claims made by ICRR under Section 1332(a), and has supplemental jurisdiction, pursuant to Title 28 U.S.C. § 1367,[2] over these counter-claims, which are compulsory under Fed.R.Civ.P. 13(a).[3]

In addition to her claims against ICRR, C. Daniel has asserted claims of negligence against the following: Airgas Carbonics, Inc., a Mississippi corporation with its principal place of business in Georgia; the Mississippi Department of Transportation; Rankin County, Mississippi; Canadian National Railway ("CNR"), a Canadian corporation with its principal place of business in Montreal, Quebec, Canada; Grand Trunk Corporation, a Delaware Corporation with its principal place of business in Delaware; and Illinois Central Corporation, a Delaware Corporation with its principal place of business in Delaware.[4]

---

[2]  Title 28 U.S.C. § 1367(a) states, in relevant part, that "in any civil action of which the district courts have original jurisdiction, the district courts shall have supplemental jurisdiction over all other claims that are so related to claims in the action within such original jurisdiction that they form part of the same case or controversy under Article III of the United States Constitution."

[3]  Fed.R.Civ.P. 13(a) states:
(a) COMPULSORY COUNTER-CLAIM.
   (1) *In General.* A pleading must state as a counter-claim any claim that—at the time of its service—the pleader has against an opposing party if the claim:
      (A) arises out of the transaction or occurrence that is the subject matter of the opposing party's claim; and
      (B) does not require adding another party over whom the court cannot acquire jurisdiction.

[4]  Grand Trunk Corporation owns Illinois Central Corporation, which in turn owns ICRR. Both Illinois Central Corporation and Grand Trunk Corporation are non-operating holding companies.  Canadian National Railway owns Grand Trunk Corporation.  Aff. of Michael T. Novak, General Counsel for the United States operating subsidiaries of CNR, ¶ 16, docket no. 106-2.

The train engineer, James Roberts, and conductor, Marcus Lovette, both Mississippi residents, sued Cryogenic and C. Daniel as a result of the subject collision. Marcus Lovette's lawsuit (Civil Action No. 5:10-cv-80-DCB-JRR) was consolidated with this case.  James Robert filed a complaint as an intervenor in this lawsuit.

All claims between C. Daniel and these additional parties have been dismissed or resolved through settlement.  The only claims remaining in this lawsuit are the counter-claims filed by C. Daniel against ICRR.

## II.  Facts

On the morning of July 26, 2009, at the time of the mishap in question, M. Daniel was driving an eighteen-wheeler truck as an employee of Cryogenic Transportation. Amended counter-claim, ¶ 8, docket no. 80.  He was on the premises of the Airgas Carbonics, Inc.'s ("Airgas") plant in Star, Mississippi.  Once he filled his truck with liquid carbon dioxide, he exited the plant and began to cross the railroad crossing at Andrew Jackson Circle.  This conjunction was identified in the federal crossing inventory as United States Department of Transportation No. 305437D.  *Id*.  The railroad crossing encompasses three sets of tracks: the spur track, which leaves the mainline and enters the Airgas facility; a mainline, which is owned and operated by ICRR; and another set of tracks, which traverse Dixie Road where it meets Andrew Jackson Circle.  *Id*; *see* survey of existing conditions, docket no. 284-5.

M. Daniel left the Airgas plant and turned north onto Andrew Jackson Circle.  He crossed the first set of tracks–the spur entering Airgas–and the cab of his truck crossed over the mainline tracks.  Suddenly, an ICRR locomotive traveling east to west collided with the tanker of his truck.  Amended counter-claim, ¶ 8, docket no. 80.  The tanker

immediately exploded, destroying the truck.[5]  M. Daniel was expelled from the cab.  He

died two days later.[6]  *Id.*

## III.  Summary Judgment

### A.  Legal Standard

Summary judgment is appropriate "if the pleadings, depositions, answers to

interrogatories, and admissions on file, together with the affidavits, if any, show that

there is no genuine issue as to any material fact and that the moving party is entitled to

judgment as a matter of law." Fed.R.Civ.P. 56(c); *see Celotex Corp. v. Catrett*, 477 U.S.

317, 322-23 (1986). In response to a motion for summary judgment, the non-moving

party must provide specific proof demonstrating a triable issue of fact as to each of the

elements required to establish the claim asserted. *Washington v. Armstrong World*

*Indus.*, 839 F.2d 1121, 1122-23 (5th Cir. 1988). The court must resolve all reasonable

doubts about the existence of a genuine issue of material fact against the movant. *Byrd*

*v. Roadway Express, Inc.*, 687 F.2d 85, 87 (5th Cir. 1982).

### B.  Federal Railroad Safety Act ("FRSA") and Pre-emption

Illinois Central Railroad asks this court to dismiss a number of C. Daniel's

negligence claims, alleging that the FRSA pre-empts them.  First the court will review

the pre-emptive effect of the FRSA on state law-based causes of action.  The FRSA

---

[5] ICRR, has submitted a video taken from an Airgas security camera which shows the
decedent exiting the Airgas plant and entering the intersection.  The last seconds of the video
show the moment of impact between M. Daniel's tanker-truck and the ICRR train.  The final
video frames are filled with the explosion of the liquid carbon dioxide from M. Daniel's tanker-
truck.

[6] C. Daniel, in her amended counter-claim, alleges that M. Daniel died on July 28, 2009,
two days after the collision.  Docket no. 80.  In other pleadings, C. Daniel alleges that M. Daniel
died in the collision on July 26, 2009.

only pre-empts state law where the Secretary of Transportation has promulgated regulations covering the subject matter.  The court, then, will evaluate each of C. Daniel's claims of negligence in the context of regulation which has been promulgated by the Secretary of Transportation governing the subject of those claims.

The United States Congress enacted the FRSA in 1970 "to promote safety in all areas of railroad operations and to reduce railroad-related accidents and incidents." *Norfolk Southern Railway Co. v. Shanklin*, 529 U.S. 344, 347, 120 S.Ct. 1467, 1471, 146 L.Ed.2d 374 (2000) (citing Title 49 U.S.C. § 20101) ("*Shanklin*").  The Act grants the Secretary of Transportation authority to "prescribe regulations and issue orders for every area of railroad safety."  *Id* (citing Title 49 U.S.C. § 20103(a)).  The FRSA specifically addresses the issue of railroad crossing grades, saying "the Secretary of Transportation shall maintain a coordinated effort to develop and carry out solutions to the railroad grade crossing problem."  *Id* (citing Title 49 U.S.C. § 20134(a)).

The Act prescribes its own pre-emptive effect on state law, and includes a savings clause which allows state law legislation and claims in areas where the Secretary of Transportation has not promulgated regulation.  *Id* at 347-48 (citing Title 49 U.S.C. § 20106).  The pre-emption and savings clause states:

> (a) National uniformity of regulation.
> (1) Laws, regulations, and orders related to railroad safety and laws, regulations, and orders related to railroad security shall be nationally uniform to the extent practicable.
> (2) A State may adopt or continue in force a law, regulation, or order related to railroad safety or security until the Secretary of Transportation [. . .] prescribes a regulation or issues an order covering the subject matter of the State requirement. A State may adopt or continue in force an additional or more stringent law, regulation, or order related to railroad safety or security when the law, regulation, or order--
> > (A) is necessary to eliminate or reduce an essentially local safety or

6

security hazard;
(B) is not incompatible with a law, regulation, or order of the United
States Government; and
(C) does not unreasonably burden interstate commerce.

Under this Section, if the Secretary of Transportation issues a regulation that "covers" the same subject as state law, it pre-empts that state law.   *Shanklin*, 529 U.S. at 352. An area is "covered," and thus pre-empted, if the "federal regulations substantially subsume the subject matter of the relevant state law."  *Id*.  Any state law or cause of action which conflicts with the Department of Transportation regulation will be displaced by federal law.  *Id* at 352-53.

Subsections (a)(2)(A), (B), and (C) reserve to the states the right to pass laws (and allows state law causes of action) related to unique "local hazards" that cannot be adequately addressed by uniform federal laws.  A "local hazard" is a specific hazardous condition that, by definition, cannot be found at many crossings across the state or region.  *Hesling v. CSX Trans. Inc.*, 396 F.3d 632, 640-41 (5th Cir. 2005).  A state law regarding a "local hazard" will not be pre-empted as long as it is compatible with the existing federal regulation and does not burden interstate commerce.  *Id* at 640.

In 2007, Congress amended the pre-emption clause of the statute, adding subsection (b), as part of the Federal Railroad Safety Improvement Act of 2007.  P.L. 110-432.  Congress added this "clarification," as the amendment is entitled, in response to a catastrophic train derailment which occurred in Minot, North Dakota in 2002, and subsequent judicial opinions issued in the related litigation.[7]  *See* House Report on the

---

[7] "On January 18, 2002, a Canadian Pacific Railway Company freight train derailed near Minot, North Dakota, and caused the release of more than 220,000 gallons of anhydrous ammonia into the air, exposing the area's population to a cloud of toxic gas, causing many people to suffer from permanent respiratory and eye damage." *Lundeen v. Canadian Pacific Ry. Co.*, 532 F.3d 682, 687 (8th Cir. 2008) (*Lundeen II*)).   Many of the injured parties sued in

7

Federal Railroad Safety Improvement Act of 2007, H.R. Report No. 110-336, 2143-44.[8]

The amendment to Title 49 U.S.C. § 20106 states:

> (b) Clarification regarding State law causes of action.
>    (1) Nothing in this section shall be construed to pre-empt an action under State law seeking damages for personal injury, death, or property damage alleging that a party--
>       (A) has failed to comply with the Federal standard of care established by a regulation or order issued by the Secretary of Transportation [. . .] covering the subject matter as provided in subsection (a) of this section;
>       (B) has failed to comply with its own plan, rule, or standard that it created pursuant to a regulation or order issued by either of the Secretaries; or
>       (C) has failed to comply with a State law, regulation, or order that is not incompatible with subsection (a)(2).

Although the United States Court of Appeals for the Fifth Circuit has not yet interpreted this amendment, the United States Courts of Appeal in the Eighth and Tenth Circuits have addressed FRSA pre-emption of negligence claims involving train-vehicle collisions since the 2007 amendment was enacted.  Both Circuits have distinguished between regulations which provide a "standard of care" with which the railroads must comply, as opposed to a specific rule that supplants the railroad or local government's decision-making.  *See Grade v. BNSF Ry. Co.*, 676 F.3d 680, 686 (8th Cir. 2012) (the 2007 clarifying amendment to the FRSA pre-emption clause is limited to narrow instances where a plaintiff alleges that the railroad negligently failed to comply with a

---

state court, and Canadian Pacific removed the actions to federal court.  In *Lundeen v. Canadian Pacific Ry. Co.*, 447 F.3d 606 (8th Cir. 2006) and *Mehl v. Canadian Pacific Ry. Co.*, 417 F.Supp.2d 1104 (D.N.D. 2006), the courts found that federal regulations governing inspection and maintenance of railroad tracks pre-empted the plaintiffs' state tort law claims. 447 F.3d at 614; 417 F.Supp.2d at 1110-11, 1116.

[8] The House Report cites *Lundeen v. Canadian Pacific Ry. Co.*, 447 F.3d 606 (8th Cir. 2006) and *Mehl v. Canadian Pacific Ry. Co.*, 417 F.Supp.2d 1104 (D.N.D. 2006), saying that Congress disagreed with these decisions and "adopted a provision to clarify the intent and interpretations of the existing pre-emption statute [. . .]."  The amendment allows state law causes of action which allege a violation of a regulatory "standard of care."  *See* Title 49 U.S.C. § 20106(b)(1)(A).

regulatory "standard of care;" the amendment does not apply to warning signal regulations that "take the final authority to decide what warning system is needed . . . out of the railroad's and the state's hands" (internal citations omitted)); *Henning v. Union Pacific Ry. Co.*, 530 F.3d 1206, 1214-1215 (10th Cir. 2008) (holding that a claim that the railroad negligently failed timely to install active warning devices after the Oklahoma Transportation Commission and the Federal Highway Administration ("FHWA") both approved upgrading from passive warning signals to active signals was pre-empted by the FRSA and Department of Transportation regulations). In the former case, where a regulatory standard of care creates an affirmative duty for the railroad to act, the plaintiff may sue, alleging the railroad violated that standard of care. *Henning*, 530 F.3d at 1215. If the regulation "displace[s] railroad decision-making authority," then that area of state law is pre-empted by the federal regulation, regardless of compliance with the regulatory requirement. *Id.*

Considering the above backdrop, this court will address each of C. Daniel's allegations of negligence individually to evaluate whether that claim is pre-empted.

### C. Analysis: Negligence Claims

C. Daniel alleges that ICRR negligently caused the collision which killed her husband. In her amended counter-claim, C. Daniel cited eighteen grounds to support her allegations of negligence against ICRR. Amended counter-claim, ¶ 10, docket no. 80. After ICRR filed its motion for summary judgment, C. Daniel reduced her claims to four, although she offers numerous facts to support each one. These claims are: (1) inadequate warning signals at the grade crossing; (2) excessive speed; (3) inadequate sight distance; and (4) failure of the ICRR engineer to take appropriate actions to avoid

the collision.  C. Daniel's response in opposition at 10, docket no. 284.  C. Daniel also challenges ICRR's claims of *per se* negligence and lack of proximate cause.  This court will address each in turn.

### 1.  Inadequate Warning Signals

This court finds that C. Daniel's claim of inadequate signalization at the railroad crossing where her husband died is pre-empted by federal law.  ICRR has provided evidence that the federal government expended funds to install the signals, thus triggering the FRSA's pre-emptive effect.  Binding precedent indicates that even significant changes at a grade crossing subsequent to installation of the federally funded signals do not act to remove federal pre-emption.  529 U.S. at 357-358.

This result seems tragic in the face of evidence offered by C. Daniel that radical changes have occurred since federal law pre-emption took effect, including the wholesale new construction of a chemical plant, which have increased the danger of negotiating this intersection and grade crossing.  If this court's reading of the cases of *CSX Transp. Inc. v. Easterwood*, 507 U.S. 658, 113 S.Ct. 1732, 123 L.d.2d 387 (1993) and *Shanklin*, as well as their progeny, is correct, then it is exclusively within the purview of Congress to address the law.

The federal government has provided monies, under the Federal Railway-Highway Crossings Program ("Crossings Program"), to fund construction projects to eliminate hazards associated with railway-highway crossings.  *Shanklin*, 529 U.S. at 348 (citing Title 23 U.S.C. § 130(a)).  The Secretary of Transportation has promulgated companion regulations governing minimum standards for railroad crossing projects that receive funds through the Crossings Program.  Title 23 C.F.R. § 646.214(b)(3) and (4)

address requirements for railroad crossing warning signals installed with federal funds

under the Crossings Program and are maintained by the FHWA.[9]  *Id* at 348-49.  The

United States Supreme Court, in *Shanklin*, evaluated the pre-emptive effect of these

regulations and found that once crossing warning signals are installed using federal

funds from this program, claims of adequacy of the warning signals are pre-empted by

federal law regardless whether the signals comply with the federal regulations at the

time of an accident.  *Id* at 357-58 (stating, "[i]t is this displacement of state law

concerning the devices' adequacy, and not the State's or FHWA's adherence to the

standard [. . .] that pre-empts state tort actions").  Federal Circuit Courts that have

considered the 2007 Congressional amendment to the FRSA pre-emption clause have

found that *Shanklin* continues to apply to warning signal claims.  *Grade*, 676 F.3d at

686; *Henning*, 530 F.3d at 1215-1216.

---

[9]  Title 23 C.F.R. § 646.214(b) states in part:

(b) Grade crossing improvements.

   (3)(i) Adequate warning devices, under § 646.214(b)(2) or on any project where Federal-aid funds participate in the installation of the devices are to include automatic gates with flashing light signals when one or more of the following conditions exist:

      (A) Multiple main line railroad tracks.

      (B) Multiple tracks at or in the vicinity of the crossing which may be occupied by a train or locomotive so as to obscure the movement of another train approaching the crossing.

      (C) High Speed train operation combined with limited sight distance at either single or multiple track crossings.

      (D) A combination of high speeds and moderately high volumes of highway and railroad traffic.

      (E) Either a high volume of vehicular traffic, high number of train movements, substantial numbers of schoolbuses or trucks carrying hazardous materials, unusually restricted sight distance, continuing accident occurrences, or any combination of these conditions.

      (F) A diagnostic team recommends them.

   (ii) In individual cases where a diagnostic team justifies that gates are not appropriate, FHWA may find that the above requirements are not applicable.

(4) For crossings where the requirements of § 646.214(b)(3) are not applicable, the type of warning device to be installed, whether the determination is made by a State regulatory agency, State highway agency, and/or the railroad, is subject to the approval of FHWA.

Section 646.214(b)(3) lists hazardous conditions which necessitate automatic gates and flashing lights at grade crossings. *Grade*, 676 F.3d at 683-684. Some of these conditions cited in this section arguably are present at the crossing in question here. These conditions are:

. . .

(B) Multiple tracks at or in the vicinity of the crossing which may be occupied by a train or locomotive so as to obscure the movement of another train approaching the crossing.

(C) High speed train operation combined with limited sight distance at either single or multiple track crossings.
. . .

(E) Either a high volume of vehicular traffic, high number of train movements, substantial numbers of schoolbuses or *trucks carrying hazardous materials*, unusually restricted sight distance, continuing accident occurrences, or any combination of these conditions.
*Id* (citing § 646.214(b)(3)(i)(emphasis added)).

If the crossing does not contain the hazards listed in Section 646.214(b)(3), the decision of what devices to install "is subject to the approval of FHWA." *Id* at 684 (citing § 646.214(b)(4)). As mentioned above, the United States Supreme Court in its *Shanklin* opinion ruled that when federal funds are used to install warning signals at grade crossings, state law based claims of inadequate signals are pre-empted even where the signals do not comply with § 646.214(b)(3). 529 U.S. at 358.

In the *Shanklin*, the widow of a motorist who was struck by a train and killed at a railroad crossing sued the railroad, alleging that the railroad had failed to maintain adequate warning signals at the crossing. The crossing signals had been installed using federal funds in 1987. The plaintiff's decedent died at the railroad crossing in 1993.

The crossing in question in the *Shanklin* case did not have automatic gates and flashing lights.  The warnings installed included "advance warning signs and reflectorized crossbucks, the familiar black-and-white, X-shaped signs that read 'RAILROAD CROSSING.'"  529 U.S. at 350.

The Court found that "once the FHWA has funded the crossing improvement and the warning devices are actually installed and operating, the regulation 'displace[s] state and private decision-making authority by establishing a federal-law requirement that certain devices be installed or federal approval obtained.'" *Id* at 354.  The Court further stated that "§§ 646.214(b)(3) and (4) pre-empt state tort claims concerning the adequacy of *all* warning devices installed with the participation of federal funds."  *Id* at 357 (referencing *CSX Transp. Inc. v. Easterwood*, 507 U.S. 658, 113 S.Ct. 1732, 123 L.d.2d 387 (1993)).

The Court addressed the effect that post-funding changes in the crossing's surroundings have on federal law pre-emption.  Because federal law pre-empts or replaces state law at the time the federally funded devices are installed, the *Shanklin* court stated, "whether conditions at the crossing have since changed such that automatic gates and flashing lights would be appropriate" would not affect whether the FRSA pre-empted state law.  *Id* at 358.

### a. Title 23 U.S.C. § 409 and Admissibility of  Evidence of Federal Funding

C. Daniel here argues that her claim of inadequate warnings is not pre-empted by federal law because: the evidence of federal funding offered by ICRR is privileged under Title 28 U.S.C. § 409 and inadmissible; ICRR cannot show that all of the warning signs at the crossing were installed using federal funds; and the signage in place at the

time of the collision at the grade crossing failed to comply with federal regulations.

The documents ICRR offers to show that federal funds were used to install warnings at the crossing, says C. Daniel, are privileged under Title 23 U.S.C. § 409. This court affirmed that privilege, she says, in an order quashing her subpoena of the information.  *See* Order of Magistrate Judge dated April 29, 2011, docket no. 231.

Indeed, this court granted a motion to quash filed by the Mississippi Department of Transportation ("MDOT"), and a protective order, which prevented C. Daniel from deposing MDOT employees regarding the "specific evidence collected or compiled by the states to obtain federal funding for safety improvements at railroad crossings as required under federal law."  *Id* at 2.

C. Daniel concludes, then, that the evidence in question is inadmissible and cannot be used to support ICRR's motion for summary judgment.  Further, C. Daniel says, it would be unfair to bar her from deposing MDOT about this evidence, only to allow it to be used later against her.

To qualify for federal funds, Title 23 U.S.C. § 152 requires states to "conduct and systematically maintain an engineering study of all public roads to identify hazardous locations, sections, and elements [. . .] and establish and implement a schedule of projects for their improvement."  *Pierce County, Washington v. Guillen*, 537 U.S. 129, 133, 123 S.Ct. 720, 154 L.Ed.2d 610 (2003) (citing Title 23 U.S.C. § 152(a)(1)).

Congress enacted Title 23 U.S.C. § 409 to address states' concerns that this data about road safety would subject them to greater liability for accidents.  *Id* at 134. This privilege statute "was implemented to foster the free flow of information" from the states and to ensure that railroads would not be hesitant to participate in providing

information to make roads and crossings safer.  *See Burlington Northern R.R. Co. v. Deatherage*, 1997 WL 33384269, *2 (N.D.Miss. 1997).  Title 23 U.S.C. § 409 states:

> Notwithstanding any other provision of law, reports, surveys, schedules, lists, or data compiled or collected for the purpose of identifying, evaluating, or planning the safety enhancement of potential accident sites, hazardous roadway conditions, or railway-highway crossings, pursuant to sections 130, 144, and 148 of this title or for the purpose of developing any highway safety construction improvement project which may be implemented utilizing Federal-aid highway funds shall not be subject to discovery or admitted into evidence in a Federal or State court proceeding or considered for other purposes in any action for damages arising from any occurrence at a location mentioned or addressed in such reports, surveys, schedules, lists, or data.

The United States Supreme Court has found that this statute bars discovery or admissibility of data and information collected specifically to satisfy the requirements of Title 23 U.S.C. § 152, such as that data compiled or collected by state departments of transportation for analysis and planning of highway projects.  *See Pierce County,* 537 U.S. at 144, 146.  The statute, however, does not bar discovery of data originally compiled for purposes unrelated to § 152, such as accident data compiled by law enforcement.  *Id.*  The statute protects data collected for planning of federally funded highway improvement projects.  Evidence merely showing that federal funds have been used to implement those projects is not governed by § 409.  *Deatherage*, 1997 WL 33384269, *2.

C. Daniel's subpoena demanded production of:

> All diagnostic studies and/or safety studies performed at the crossing identified as crossing no. 305437D which is located at Star, Mississippi at the intersection of Andrew Jackson Circle and Dixie Road at the Airgas plant.  Subpoena, docket no. 186.

The Magistrate Judge's order quashing this subpoena explains that Title 23 U.S.C. § 409 must be strictly construed, and that it bars discovery of information

15

compiled by the states to obtain federal funding.  April 29, 2011 order at 2 (citing *Pierce County*, 537 U.S. at 145), docket no. 231.  The Magistrate Judge cited the affidavit of Robert A. Burt II ("Burt"), Special Projects Engineer, who was the Director of the Freight, Rails, Ports and Waterway Division of MDOT during the time the safety studies and data were compiled.  The affidavit recites that this information was collected to obtain federal funding.  *See id*.  C. Daniel's subpoena specifically asked MDOT to produce this privileged information and, therefore, was quashed.

The statute, however, does not bar evidence that federal funding was used for a crossing or highway project.  *See Deatherage*, 1997 WL 33384269, *2.  Federal funding is a necessary ingredient for the court to find federal law pre-emption with respect to the adequacy of railroad crossing signage.  If Title 23 U.S.C. § 409 operated to bar evidence of federal funding, this statute "would eliminate the doctrine of federal pre-emption of inadequate signalization claims, as there would be no way to prove that federal funds were used to install or upgrade signalization at specific crossings."  *See id*.  The Magistrate Judge's order only precluded discovery of privileged information, specifically diagnostic reports and safety studies compiled by MDOT to obtain federal funding.

C. Daniel filed a motion to reconsider [docket no. 250], asking the court to allow her to depose MDOT employees regarding:

- The July 26, 2009 accident at crossing no. 305437D wherein Michael Daniel was hit by an Illinois Central train;
- Their investigation, notes, photographs, drawings or any other record they may have of their inspections of the crossing no. 305437D;
- The March 28, 2004 accident at crossing no. 305437D wherein LC McCallum was driving a truck and was hit by an Illinois Central/Canadian National train;
- The December 15, 2005 accident at crossing no. 305437D wherein Jeff Wright was driving a truck and was hit by an Illinois Central/Canadian National train.

16

C. Daniel's motion to reconsider, ¶ 2, docket no. 250.

C. Daniel has focused her discovery efforts, with respect to MDOT, on obtaining accident and safety data.  C. Daniel never asked to depose an MDOT representative on the narrow issue of whether federal funding had been used at the crossing.

This court is persuaded that Burt's affidavit and the attached documents showing final plans and receipts for crossing warnings installed at the crossing in question [docket no. 268-9] are admissible.  These documents support ICRR's claim that federal funds were used to install signals at the railroad crossing at Andrew Jackson Circle.

> b.  Whether ICRR has shown that the signs in place at the time of the accident were installed using federal funds.

C. Daniel argues that although the FRSA may pre-empt challenges to the adequacy of warnings and signals installed with the participation of federal funds, ICRR has not provided evidence that the warnings and signals in place at the crossing at the time of the accident were installed using federal funds.  C. Daniel has provided a timeline of changes to the area surrounding the crossing.

C. Daniel says that the railroad crossing in question has been in existence since the 1970's and federal funds were used sometime in the early 1980's to install signals. The crossbuck present in front of the mainline was installed between 2005 and 2009, and was not installed with federal funds.  Dep. Dinning, pp. 14-15 (testifying that a crossbuck was added to the crossing between 2005 and 2009); Dep. McCallum, p. 14 (testifying that there was no stop sign on Andrew Jackson Circle south of the spur track in 2004); Dep. Wright, p. 15 (testifying that a crossbuck was placed south of the main line after he had an accident at the crossing in 2005).  Other changes are also cited by C. Daniel, to wit, addition of the spur track with its own signage, removal of a siding

17

track, and the construction of the Airgas plant in 1986 and 1987.  C. Daniel also points to a "3-tracks sign" at the spur crossing installed by the railroad.  Opposition to motion for summary judgment at 21; Ex. 2 Loumiet Report, pp. 12-13, docket no. 284-2.

C. Daniel cites *Gauthier v. Union Pacific Railroad Co.*, 644 F.Supp.2d 824 (E.D.Tex. 2009), in which the District Court denied summary judgment, finding that the defendant did not show that the actual crossing warnings in question were installed using federal funds when the federally funded project occurred in 1996, but internal railroad emails in 2005 indicated the railroad subsequently had installed or replaced the warning signals.  *Id* at 837.

The reasoning urged by C. Daniel fails to address key underpinnings of federal pre-emption of state law.  When pre-emption applies, federal statutory law "displace[s] state and private decision-making authority" to determine whether crossing signals are sufficient.  *See Hesling v. CSX Trans. Inc.*, 396 F.3d at 645 (citing *CSX Transp. Inc. v. Easterwood*, 507 U.S. 658, 113 S.Ct. 1732, 123 L.d.2d 387 (1993)).  Once pre-emption attaches, when the federal government approves funds for the crossing signals and the signals are installed, state statutory and common law becomes inapplicable.  *See id*.

The Fifth Circuit in *Hesling v. CSX Transportation* found that state tort law was pre-empted, even after MDOT notified the railroad that changes at a crossing necessitated installation of automatic crossing gates.  *See* 396 F.3d 644-45.  In *Hesling*, federal funds initially were used to install crossing warnings in 1981.  *Id* at 645.  In 1994 MDOT notified the railroad that a diagnostic survey team recommended gates at the crossing in question.  *Id* at 635.  Two years later on October 25, 1996, when plaintiff's decedent was struck by a train while driving across the crossing, the railroad

18

had not installed the necessary automatic gates.  *Id*.

The Fifth Circuit affirmed a magistrate judge's ruling that federal law pre-empted evidence regarding inadequate signalization.  *See id* at 645.  The court found that state law was pre-empted beginning in 1981 when federal funds were provided "for the installation of passive warning devices that were present" at the crossing in question, despite the subsequent finding by MDOT that automatic crossing gates were necessary.  *Id.*

More recently, the Tenth Circuit in the case of *Henning v. Union Pacific R.R. Co.*, addressed a similar scenario.  A teenager was killed at a railroad crossing when his car was struck by a train.  The crossing in question was equipped with passive warning devices–crossbucks and a stop sign–originally installed with federal funds.  530 F.3d at 1211.  In *Henning*, the city where the crossing was situated requested installation of flashing signals and gates in 1999.  *Id*.  In September of 2001, the Oklahoma Transportation Commission recommended this upgrade and the FHWA approved federal funding.  *Id*.  The active warning system was not installed at the grade crossing until November of 2002, less than a month after the teenager was killed.  *Id*.  Despite a three year delay between the first recognition that the crossing should have active signals and the installation of those signals, the Tenth Circuit found the plaintiff's signalization claims were pre-empted by the FRSA and companion regulations.

In the present case, ICRR has provided an affidavit from MDOT employee Burt, stating that "on or about November 4, 1982, two crossbuck blades and two multiple track crossing signs were installed at or near crossing No. 305437D" and "paid for with federal funds."  Burt aff., ¶ 6, docket no. 268-9.  C. Daniel has not contested Burt's

statement that federal funds were used to install some of the crossbucks and multiple track crossing signs at the intersection in question.

The evidence provided by C. Daniel indicates that a spur track and signage have been added to the crossing.  She provides no indication that the federally funded warning signs have been removed.  The result here seems harsh in light of the fact that the M. Daniel was exiting a chemical plant built entirely after the installation of the federally funded warning signals.  This court finds, however, that the Fifth Circuit and its peers have spoken to this point, and C. Daniel's complaint of inadequate warning signals is pre-empted by federal law.

c.  Installed Signs' Compliance with Federal Standards

Federal regulations require that signals and warnings must comply with the FHWA's Manual of Uniform Traffic Control Device ("MUTCD") standards.  *Easterwood*, 507 U.S. at 666; Title 23 C.F.R. § 646.214(b)(1).[10]  C. Daniel argues that because the crossing where her husband was killed did not meet all of the specifications set out in the MUTCD, the issue of signal adequacy at this crossing is excepted from federal law pre-emption.

C. Daniel cites expert James R. Loumiet's report stating that under MUTCD (2003), § 8B.03, because the angle of the crossing restricted sight distance, an additional crossbuck sign should have been installed on the left side of the highway and that the backs of the crossbuck blades at the crossing were missing a strip of

---

[10]  Title 23 C.F.R. § 646.214(b)(1) states:
(b) Grade crossing improvements.
   (1) All traffic control devices proposed shall comply with the latest edition of the Manual on Uniform Traffic Control Devices for Streets and Highways supplemented to the extent applicable by State standards.

retroflective white material required by the MUTCD.  C. Daniel's opposition to motion for summary judgment at 23 (citing Loumiet report, p. 29-30), docket no. 284.

As mentioned above, the United States Supreme Court and Fifth Circuit both have found claims of inadequate signalization to be pre-empted despite changes to the crossing which occurred after installation of federally funded warning signs. The Fifth Circuit, in *Helsing,* found the plaintiff's claims were pre-empted even when the crossing signals clearly did not satisfy federal regulations.  C. Daniel has cited no case authority to convince this court that signal and warning deficiencies under the MUTCD provide a basis for tort liability.  This claim is an iteration of the arguments rejected by the United States Supreme Court in *Shanklin*.  Pre-emption of signalization claims rests not on compliance with federal regulations, but on the replacement of the railroad's decision-making authority about signal requirements by federal regulation.  *Shanklin*, 529 U.S. at 354.

This court is persuaded that federal law pre-empted state law at the time federally funded signals were installed at this crossing.  The intervening installation of additional signs does not operate to replace federal law with state law.  Tort claims based on the adequacy of signals and warnings, then, are pre-empted by federal law.

### 2.  Excessive Speed

C. Daniel offers two arguments related to train speed.  Her first argument is that even though the ICRR train was operating within federally established speed limits, the train engineers had a duty to reduce the train's speed and operate at a safer speed to minimize the dangers posed by the Andrew Jackson Circle grade crossing.  Secondly, says C. Daniel, even if excessive train speed arguments are pre-empted by federal

speed limits, her claim in this instance is not pre-empted because it falls into a "local hazard" exception.

The Department of Transportation has established maximum speed limits for freight and passenger trains, based on the railroad track classification upon which the train is operating. *Easterwood*, 507 U.S. at 673; Title 49 C.F.R. 213. Track classification takes into consideration a number of variables, including "gage, alignment, curvature, surface uniformity [. . .]." 507 U.S. at 673. "These speed limits must be read as not only establishing a ceiling, but also precluding additional state regulation" related to train speed. *Id* at 674. Train speed limits set by Department of Transportation regulations take into consideration "the conditions posed by grade crossings." *Id* at 675. Any claims of negligence based on train speed are pre-empted by federal law. *Hesling*, 396 F.3d at 638 (citing *Easterwood*, 507 U.S. at 673).

The parties agree that this collision occurred on a class 4 railroad track. Title 49 C.F.R. §213 sets a maximum speed of 60 miles per hour for freight trains operating on a class 4 track. *See* Title 49 C.F.R. §213. The data recorders on the train, unchallenged by C. Daniel's expert, set the speed of the train at a maximum of 32.5 miles per hour before the engineer applied the brakes. *See* Loumiet report at 37, Table 4-Train and Truck Positions and Speeds Before Impact, docket no. 284-2. The ICRR train, then, was traveling almost thirty miles per hour under the speed limit set by federal regulations.

C. Daniel argues that her excessive speed claim is not pre-empted by the FRSA because it fits into the "local hazard" exception to pre-emption, codified at Title 49 U.S.C. § 20106(a)(2)(A), which states:

22

> A State may adopt or continue in force an additional or more stringent law, regulation, or order related to railroad safety or security when the law, regulation, or order--
>> (A) is necessary to eliminate or reduce an essentially local safety or security hazard;

The local hazard exception, generally applies to a specific circumstance which "relates to the avoidance of a specific collision." *Hesling*, 396 F.3d at 640. "A condition that can be or is present at many, or most sites cannot be a specific individual hazard." *Id*. The Fifth Circuit in the *Hesling* case cited as examples of local hazards: a crossing with short sight lines and repeated warning signal device malfunctions and one where heavy snow created poor visibility. *Id* at 640 n.4.

C. Daniel points to a Southern District of Mississippi case, *Cameron v. Wall*, 2011 WL 554076 (S.D.Miss. 2011), in which the district court judge contemplated whether a car sitting on the tracks fit the definition of a "local hazard," so as to create an exception to federal law pre-emption. *See Cameron*, 2011 WL 554076, *5. In *Cameron*, the district judge conflated the local hazard exception with the train engineer's general duty to operate the train in a safe manner, so as to avoid collision. The *Cameron* court, stated, "the substantial dispute here is whether Plaintiff's allegation that Defendants 'fail[ed] to maintain a safe speed through the intersection' relates to a duty to slow or stop to avoid a specific, individual hazard or a more general duty to operate the train at a slower speed." *Id.*

ICRR says that the "local hazard" savings clause does not apply to the crossing in question because issues cited by C. Daniel, such as the track layout, the angle at which the road crosses the track, and signal and warning signs, could occur anywhere across the state, and do not qualify as a local hazard. *See Wright v. Illinois Central*

*R.R. Co.*, 868 F.Supp. 183, 187 (S.D.Miss. 1994) (J. Barbour);  *Bowman v. Norfolk So.*

*R.R. Co.*, 832 F.Supp. 1014, 1017-18 (D.S.C. 1993) (crossing's proximity to roadway

with heavy traffic and use of crossing by trucks transporting hazardous materials found

not to be a local hazard); *O'Bannon v. Union Pacific R.R. Co.*, 960 F.Supp. 1411, 1421

(W.D.Mo. 1997) (steep grade, angle of crossing, and proximity to highway not deemed

a local hazard); and *Deatherage*, 1997 WL 33384269, at *3 (limited sight distance does

not constitute a local hazard).

      To the extent that C. Daniel attempts to place a duty on ICRR to operate its train

at a speed slower than the regulatory speed limit, her claim is pre-empted by federal

law.  The ICRR train engineer, however, had a duty to respond appropriately to avoid a

collision with the tanker-truck sitting on the main line railroad tracks.  This duty does not

impose a specific limit on the train's operating speed, but rests on factual issues to be

decided by a jury as to whether the train engineer's efforts to avoid the collision were

sufficient.

                            3.  Inadequate Sight Distance

      C. Daniel has cited a number of variables affecting sight distance at the grade

crossing in question, including: the skewed angle between the roadway and the railroad

tracks, and an overgrowth of vegetation.  C. Daniel's opposition to motion for summary

judgment at 11, docket no. 284.  ICRR contends that Miss. Code Ann. § 77-9-254 sets

a sight distance requirement of 300 feet at railroad grade crossings as a matter of law.

If the facts indicate that the sight distance at a crossing exceed the 300 feet established

in the statute, says ICRR, then the railroad has satisfied its legal duty.  ICRR argues

that all other factors affecting sight distance, such as the skewed angle of the crossing,

are pre-empted because they are taken into consideration when the FHWA approves warning signals installed at the crossing.

The Mississippi statute cited by ICRR establishes the railroad's duty to clear the right-of-way of vegetation which would obstruct the view of a motorist traversing the railroad crossing.  This statute requires, for crossings without automatic flashing lights or gates, that the railroad remove vegetation from its right-of-way for 300 feet in either direction from the centerline of the road or highway which crosses the tracks.  *See* Miss. Code Ann. § 77-9-254.[11]

Miss. Code Ann. § 77-9-254 was enacted in 2004, and this court finds no interpretation of it by a Mississippi appellate court.  Several United States District Courts have addressed the issue of sight distance at Mississippi grade crossings since the enactment of this statute.  In *Brown v. Nat'l R.R. Passenger Corp*., 2011 WL 1130545 (S.D.Miss. 2011), the district court found that this statute "established the required sight distance for public railroad crossings in Mississippi."  2011 WL 1130545 at *9.  The court granted summary judgment with respect to the issue of sight distance saying that the evidence "reveal[ed] that the sight distance from the railroad advance

---

[11] Miss. Code Ann. § 77-9-254(1) states:
(1) At all public highway railroad grade crossings that do not have automatic flashing lights and/or gates where vegetation would materially obstruct the view of a vehicle operator exercising reasonable care of a train approaching a grade crossing from either direction, every railroad, as is reasonably practical, shall remove from its right-of-way which it owns or operates, such vegetation as weeds, brush, climbing vines, shrubbery and trees, for a distance of not less than three hundred (300) feet in each direction from the centerline of the public road or highway, unless the authorized train speed is ten (10) miles per hour or less, in which case the distance from the centerline of the public road or highway shall be not less than one hundred (100) feet. At the outer edges of the public road or highway, the vegetation shall be removed to a width of twenty-five (25) feet on each side of the centerline of the railroad or to the full width of the railroad's operating right-of-way whichever is shorter. The area cleared of vegetation may be tapered inward from its full width at the involved roadway to the outer limits of the area being cleared so as to create a triangle, or it may be cleared at a constant width so as to form a rectangle.

warning sign [. . .] [was] approximately 2,658 feet," far exceeding the 300 feet required by law. *Id*.

The district court in *Waters v. Nat'l R.R. Passenger Corp*., 2007 WL 3355394 (S.D.Miss. 2007), denied summary judgment based on evidence that "the railroad tracks [. . .] curved behind a line of trees, and one witness testified that he complained to Illinois Central about the vegetation north of the crossing." *Id* at *5. In *Waters*, a Federal Railroad Administration Operations Inspector, who was riding in the locomotive of the train at the time of the accident, stated that he "guessed" the sight distance from the crossing was approximately 400 feet. *Id* at *4. The court quoted the Mississippi statute, but did not relate the vegetation removal requirement to a statutory requirement for sight distance. Despite the Federal Railroad Inspector's testimony that the sight distance exceeded the 300 feet required in the statute, the court found that "the question of whether Illinois Central negligently failed to remove vegetation from its right-of-way is a fact question for the jury." *Id*.

Finally, C. Daniel cites *Baker v. Canadian Nat'l/ Illinois Centr. Railway Co.*, 397 F.Supp.2d 803 (2005), *aff'd on other grounds*, 536 F.3d 357 (5th Cir. 2008), in which the district court found that sight distance and whether visibility is obstructed at a crossing are issues of fact which, given sufficient evidence, "cannot be resolved via summary judgment." *Id* at 816. In the *Baker* case, decided after Mississippi enacted the abovementioned statute, the court was faced with competing expert testimony regarding sufficiency of the sight distance at the crossing. The defendant's expert stated that:

> based on my calculation of train speed and Plaintiff's vehicle positioning, when the Plaintiff's truck was located at the stop bar, the train was located

216 feet from the crossing, which is 17.5 feet clear of the tree line, south
of the southernmost edge of the crossing. [. . .] [A]t approximately 216
feet, the train appeared huge, clear of the tree line, and dominated the
sight distance picture. *Id* at 816 n.11.

The court in *Baker* did not mention Miss. Code Ann. § 77-9-254, or its effect on

the adequacy of the sight distance at the crossing.

This court is not persuaded that the Mississippi legislature has established a

minimum required sight distance through enactment of Miss. Code Ann. § 77-9-254.

Mississippi courts have not specifically addressed this issue, and the sum total of the

federal courts decisions on this issue do not provide a clear answer.  The statute itself

mentions only the requirement that the railroad clear vegetation from its right-of-way,

not that it provide a certain minimum sight distance at each crossing.  A requirement to

clear vegetation for 300 feet from the crossing does not necessarily equate to a

motorist having 300 feet of visibility from the crossing looking down the railroad track.

Further, as expert Loumiet's report demonstrates, the sight distance necessary to see a

train in time to avoid a collision will vary depending on the speed limit on the railroad

tracks.  This court finds, then, that the adequacy of the sight distance at the intersection

where the accident occurred is a material question of fact which precludes summary

judgment.

This court agrees with ICRR, however, that some variables related to sight

distance are pre-empted by federal law.  As mentioned in Sections III.C.1. and III.C.2.

of this opinion, adequacy of crossing warnings and train speed are pre-empted by

federal law.  These issues are interwoven with, and dependent upon, the skewed angle

between the roadway and railroad track, and that angle's effect on M. Daniel's ability to

see the train.  As such, the angle between the railroad track and the roadway is pre-

empted as a factor considered by the Department of Transportation when establishing warning signal requirements and train speed limits.

Variables not subsumed within warning signal requirements and train speed limits, such as an overgrowth of vegetation, may be considered by a jury to determine ICRR's negligence under state law.

### 4.  Failure of the ICRR Engineer to Avoid the Collision

Neither party disputes that the train engineer, James Roberts, applied the emergency brake on the front locomotive of the train prior to colliding with the decedent. The parties contest the appropriateness of his actions and whether an alternate braking procedure–applying an "independent brake"–could have prevented the collision.

The train involved in the accident was operating in a "lite" locomotive configuration, meaning a locomotive traveling with no rail cars.[12]  When the train is operating in this configuration, C. Daniel's argues, to stop in the shortest possible distance the engineer must apply the "independent brake" first and then apply the emergency brake.  According to C. Daniel , the type of brake valve installed in the locomotive in this collision is called a Wabtec 30-CDW brake valve.  In support of her argument, C. Daniel points to the manual for the Wabtec 30-CDW brake valve, which states:

> ***Emergency "Lite" Locomotive Operation***
> **WARNING:** In an emergency situation, when operating a "Lite" Locomotive, <u>moving the Independent Brake Valve handle to full application position is the fastest way to develop brake cylinder pressure</u>

---

[12]  Title 49 C.F.R. § 229.5 defines "lite locomotive" as "a locomotive or a consist of locomotives not attached to any piece of equipment or attached only to a caboose."  C. Daniel's expert Richard Beall describes this "lite" operation as locomotives with no rail cars.  Docket no. 284-3 at 2.

on the locomotive up to the full Independent Brake Cylinder pressure
setting.  Immediately after moving the Independent Brake Valve handle to
full application position, the brake valve handle should be placed in
Emergency position.  Failure to comply with this procedure during an
emergency brake application when operating a "Lite" locomotive consist
*could extend the stopping distance and increase the likelihood of*
*equipment damage and/or personal injury*.  Loumiet report at 39-40,
docket no. 284-2 (emphasis added).

ICRR's representative, Steve Condon, stated in his deposition that he had been

told about the braking procedure which was recommended in the Wabtec 30-CDW

brake valve manual, but he disagreed with applying the independent brake valve before

the emergency brake when operating in "lite" mode.  *See* 30(B)(5) & (6) depo. of Steve

Condon, 78:10-80:24.

C. Daniel also cites Rule 311 of the Canadian National Air Brake & Train

Handling Rules as supportive of her position.[13]  C. Daniel's fails, however, to provide

the actual rules or evidence that these rules governed the ICRR engineer's conduct.

C. Daniel says that the train engineer's negligent failure to apply the correct

brake, in compliance with the manufacturer's brake valve manual, as well as other

rules, proximately caused the collision.

ICRR has provided a sworn affidavit from its expert in locomotive handling,

Foster Peterson, in which Peterson states that the train engineers operating the ICRR

train in question acted appropriately by applying the emergency brake.  Docket no. 268-

12.  Peterson states that "accepted train handling procedures in North America require

---

[13]  C. Daniel, in her response in opposition to summary judgment [docket no. 284],
states that the Canadian National Air Brake & Train Handling Rules provide an exception to the
requirement that the emergency brake be applied.  She quotes the exception as stating:
    These guidelines do not apply when emergency braking is necessary to protect life or
    property.  The use of maximum available braking effort may be required in these
    situations.

that when an engineer determines a collision is imminent at a crossing, the train's emergency brakes should be applied."  Peterson aff., ¶ 9, docket no. 268-12.  Peterson argues that "[h]aving an accepted, uniform method of braking and response to an emergency event is preferable as it minimizes the risk [. . .] and does not delay response [. . .]."  *Id*.

ICRR further argues that no material issue of fact exists regarding this claim because C. Daniel has produced no competent summary judgment evidence in support of her claim.  ICRR says that this court must disregard C. Daniel's expert's statements because they are unsworn, and thus not competent to defeat a motion for summary judgment.

After ICRR challenged the sufficiency of C. Daniel's summary judgment evidence, she filed a supplement to her response in opposition to summary judgment, attaching an excerpt from expert James Loumiet's deposition in which he verifies under oath his previously submitted expert expert report. Docket nos. 293, 293-1.

Both expert Loumiet and ICRR's representative Condon have referenced the manufacturer's brake valve manual which instructs that in an emergency when operating a "lite" locomotive configuration the engineer should apply the independent brake first before applying the emergency brake.  ICRR's expert claims that this recommendation is erroneous and the safer course of action is for engineers to maintain uniform procedures for dealing with emergencies.

This court finds that a material issue of fact precludes summary judgment with respect to whether the engineers acted properly to stop the train.

### D.  Analysis:  Negligence *Per Se* and Proximate Cause

Federal Motor Carrier regulation, Title 49 C.F.R. § 392.10(a),[14] mandates that

commercial truck drivers hauling hazardous material must stop before all railroad

crossings.  Violation of this statute by M. Daniel, says ICRR, constituted negligence *per*

*se*. *See Stong v. Freeman Truck Line, Inc.*, 456 So.2d 698, 708-711 (Miss. 1984).

ICRR has submitted a security video from Airgas which shows that M. Daniel did not

come to a complete stop at the stop signs or railroad tracks at the crossing.  ICRR

argues that this video shows that M. Daniel violated Title 49 C.F.R. § 392.10(a) (which

requires he stop before the railroad crossing); and that M. Daniel's negligence was

proximately and solely responsible for the accident.

C. Daniel says that her husband, M. Daniel, was in an untenable situation in

which the configuration of the crossing and stop signs forced him to pick and choose

which law to disobey.  Title 49 C.F.R. § 392.10(a) required that he stop at the railroad

---

[14]  Title 49 C.F.R. § 392.10(a) states in pertinent part:
[. . .] the driver of a commercial motor vehicle specified in paragraphs (a)(1) through (6) of this section shall not cross a railroad track or tracks at grade unless he/she first: Stops the commercial motor vehicle within 50 feet of, and not closer than 15 feet to, the tracks; thereafter listens and looks in each direction along the tracks for an approaching train; and ascertains that no train is approaching. When it is safe to do so, the driver may drive the commercial motor vehicle across the tracks in a gear that permits the commercial motor vehicle to complete the crossing without a change of gears. The driver must not shift gears while crossing the tracks.
    (1) Every bus transporting passengers,
    (2) Every commercial motor vehicle transporting any quantity of a Division 2.3 chlorine.
    (3) Every commercial motor vehicle which, in accordance with the regulations of the Department of Transportation, is required to be marked or placarded with one of the following classifications:
[. . .]
    (4) Every cargo tank motor vehicle, whether loaded or empty, used for the transportation of any hazardous material as defined in the Hazardous Materials Regulations of the Department of Transportation, Parts 107 through 180 of this title.
    (5) Every cargo tank motor vehicle transporting a commodity which at the time of loading has a temperature above its flashpoint as determined by § 173.120 of this title.
    (6) Every cargo tank motor vehicle, whether loaded or empty, transporting any commodity under exemption in accordance with the provisions of Subpart B of Part 107 of this title.

tracks before crossing, but Miss. Code Ann. § 63-3-901[15] prohibits a driver from stopping with his vehicle sitting on the railroad tracks.  The stop signs and tracks were situated such that M. Daniel had to either stop with his trailer sitting on the railroad tracks in a position with very limited visibility, or continue through the stop signs and across the tracks without stopping.  C. Daniel argues that M. Daniel proceeded across the railroad tracks as safely as possible, given the hazards inherent in the crossing.

Further, argues C. Daniel, negligence *per se* does not apply here because it requires ICRR to show that M. Daniel's violation of a statute was the proximate cause of the accident.  The record evidence, says C. Daniel, shows that ICRR's negligence was the proximate cause of the collision.

"Mississippi recognizes the doctrine of negligence *per se*, which in essence provides that the breach of a statute or ordinance renders the offender liable in tort without proof of a lack of due care."  *Wayne County School Dist. v. Worsham*, 2012 WL 954156 (Miss. 2012).  Finding negligence *per se* applicable to a party's actions, however, does not end the inquiry.  "To prevail in an action for negligence *per se*, a party must prove that he was a member of the class sought to be protected under the statute, that his injuries were of a type sought to be avoided, and that violation of the statute proximately caused his injuries."  *Gallagher Basset Svcs., Inc. v. Jeffcoat*, 887 So.2d 777, 787 (Miss. 2004).

---

[15] Miss. Code Ann. §63-3-901 states in pertinent part:
No person shall stop, stand or park a vehicle, except when necessary to avoid conflict with other traffic or in compliance with the directions of a police officer or traffic control device, in any of the following places:
   . . .
   c. Within an intersection;
   . . .
   i. Within fifteen feet of the nearest rail of a railroad crossing;

The evidence shows that M. Daniel violated a statute specifically designed to prevent accidents at railroad crossings, such as this one.  The court has reviewed the Airgas security video, which shows that M. Daniel proceeded across the grade crossing without stopping before the railroad tracks.  Further, C. Daniel's expert Loumiet indicates in his report that M. Daniel proceeded through the intersection, without stopping, at a speed that ranged between approximately three and six miles per hour. Loumiet report, Table 4, at 37, docket no. 284-2.

As to proximate cause, the record is replete with factual evidence and expert opinions which support both sides.  Whether M. Daniel's failure to stop was the proximate cause of the collision is a disputed question of fact, which cannot be decided at this stage.

The parties will have the opportunity to present evidence at trial regarding the cause or causes of this collision.  ICRR may be entitled to an instruction that M. Daniel had an obligation under the law to stop at the railroad tracks, and was negligent for not stopping.  To find that M. Daniel's failure to stop provides a defense for ICRR, however, the jury must determine that M. Daniel's actions proximately caused the accident. *Thomas v. McDonald*, 667 So.2d 594, 596-97 (Miss. 1995).  Once the parties have submitted their proposed jury instructions, this court will determine the appropriate instruction regarding M. Daniel's alleged negligence.

### IV.  Conclusion

For the reasons cited above, this court grants in part and denies in part ICRR's motion for summary judgment [docket no. 268].  The grounds asserted by C. Daniel regarding inadequate signalization at the grade crossing and train speed are pre-

empted by federal law.  The issues of sight distance at the crossing and whether the train engineer was negligent in his attempts to avoid the collision are issues of fact which will be carried to trial.  ICRR's motion for leave to file excess pages [docket no. 290] is unopposed and is granted.  The court has considered all of ICRR's pleadings, including the excess pages, when deciding its motion for summary judgment.

ICRR's motions to exclude C. Daniel's experts [dockets no. 273, 275, 298] are denied at this time and will be carried to trial.  The court will hear the issues related to admission of the experts testimony prior to trial.[16]

The motion to set/reset hearings [docket no. 305] filed by C. Daniel is moot.

The motion to bifurcate [docket no. 266] filed by ICRR involves a party which has previously been dismissed from this case and is denied as moot.

**SO ORDERED AND ADJUDGED**, this, the 30th day of September, 2012.

_____/s/   Henry T. Wingate_____
UNITED STATES DISTRICT JUDGE

Order Granting in Part and Denying in Part Summary Judgment
3:09-cv-473-HTW-LRA

---

[16]  Reference to plaintiff's "expert" in this opinion is not meant to imply that the court has accepted him as such.  This court will conduct hearings prior to trial to qualify the experts and determine the appropriate treatment of their testimony.